## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **AMAURYS J. CORDERO,** | : | |
| **individually and on behalf of other** | : | |
| **similarly situated individuals,** | : | |
| **Plaintiff** | : | **Class Action** |
| | : | |
| **v.** | : | **C.A. No.** |
| | : | **Jury Trial Demanded** |
| **AMTROL, INC., alias, and** | : | |
| **WORTHINGTON INDUSTRIES, INC.,** | : | |
| **alias,** | : | |
| **Defendants** | : | |

## CLASS ACTION COMPLAINT

### I.    Introduction

1.      This is an action brought by Plaintiff Amaurys J. Cordero ("Plaintiff") against his former employers, Defendants AMTROL, Inc., alias, and Worthington Industries, Inc., alias, seeking compensatory, and punitive liquidated damages, as well as attorneys' fees, interest, costs and other equitable relief, arising out of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII"), Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1, *et seq.* ("FEPA"), Rhode Island Civil Rights Act, R.I.G.L. §42-112-1, *et seq* ("RICRA")*,* and the Rhode Island Whistleblower Protection Act ("Whistleblower Act"), R.I. Gen. Laws § 28-50-1.

2.      These claims are all brought pursuant to the class action provisions of Federal Rules of Civil Procedure 23(a) and 23(b).

3.      Additionally and in the alternative, Plaintiff brings this action individually and as a potential multi-party action, separate and apart from the class action claims set forth herein.

### II.    Parties

4.      Plaintiff resides in the City of Cranston, County of Providence, State of Rhode Island, and at all relevant times to this action, was employed by Defendants.

5. Defendant AMTROL, Inc., alias, ("AMTROL") is a domestic corporation duly organized and incorporated under the laws of the State of Rhode Island, with a principal office located at 1400 Division Road, West Warwick, RI 02893.

6. Defendant Worthington Industries, Inc., alias ("Worthington") is a foreign corporation duly organized and incorporated under the laws of the State of Ohio, with a principal office located at 200 Old Wilson Bridge Road, Columbus, OH 43085 and a place of business located at 1400 Division Road, West Warwick, RI 02893.

### III.  Jurisdiction

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, 2201, and 2202.

### IV.  Venue

8. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims in Plaintiff's Complaint occurred in the District of Rhode Island, and, at all times relevant to Plaintiff's Complaint, Defendants did business in the District of Rhode Island, and, therefore, had minimum contacts with the District of Rhode Island and is deemed to reside in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. § 1391.

### V.  Exhaustion of Administrative Remedies

9. On or about November 14, 2019, Plaintiff filed a Charge of Discrimination alleging race, ethnicity, and/or color discrimination with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC").

10.     Thereafter, with more than 120 days but not more than two (2) years having elapsed since the filing of Plaintiff's Charge, Plaintiff filed a Request for Notice of Right to Sue with the RICHR and the EEOC.

11.     Plaintiff was issued a Notice of Right to Sue by the RICHR on July 7, 2020.

12.     Accordingly, because Plaintiff has satisfied all administrative and/or jurisdictional requirements prior to filing a lawsuit, the Plaintiff has timely instituted suit in the within matter.

## VI.   Class Action Allegations

### *Class Action Allegations under FRCP Rule 23*

13.     The aforementioned Plaintiff brings this action on behalf of himself and all other similarly situated current and former employees of Defendants, who were and/or are affected by the discriminatory actions and/or the discriminatory disparate impact of actions, policies and procedures of Defendants in violation of Title VII, the FEPA, and the RICRA as described herein, pursuant to Federal Rules of Civil Procedure Rule 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

14.     In addition, the aforementioned Plaintiff brings this action in his individual capacity, separate and apart from the class action claims set forth herein.

15.     Plaintiff seeks relief on behalf of a class **("Class")** defined as follows:

All individuals employed by Defendants of Hispanic origin, appearance, and/or first language Spanish speakers ("Hispanics") during the period of three years before the filing of this Complaint forward.

16.     Plaintiff is similarly situated with Hispanics employed by the Defendant in that they were all subject to the same discriminatory actions, practices, policies and procedures of Defendants, the same hostile work environment and working conditions, worked in the same facility, and were

subject to the same unlawful practices alleged in this Complaint and sustained the same or similar damages as a result.

17.     Plaintiff reserves the right to amend said class definition consistent with information obtained through discovery.

18.     Class certification for the claim is appropriate under Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) because all of the requirements of those Rules are met:

19.     *Numerosity - FRCP* 23(a)(1):  The Class is so numerous that joinder of all members is impractical.

    a.     The Defendant has, on information and belief, approximately one hundred (100) Hispanic individuals worked at Defendants' facility at any given time.

    b.     While the exact number and identities of Class members are unknown at this time, and can only be ascertained through appropriate discovery, Plaintiff claims, on information and belief, that at least one hundred and thirty (130) putative class members, if not more, have worked for the Defendants under the discriminatory conditions outlined herein within the past three (3) years.

20.     *Commonality* - FRCP 23(a)(2):  There are numerous and substantial questions of law and fact common to all the members of the Class that predominate over individual issues, especially, the questions of whether the practices alleged herein exist and were applied to all Class members. The common questions raised by Plaintiff's claims include:

    a.     Whether Defendants maintained a hostile work environment for Hispanic employees, including but not limited to condoning routine racist and discriminatory comments

and abuse from Caucasian employees, in-particular Supervisors, directed at Hispanics generally and individually.

b.    Whether Defendants engaged in promotion and pay rate decision in a manner which resulted in Hispanics being promoted and given raises at disproportionally lower rates than Caucasian co-workers with similar qualifications.

c.    Whether these pay raise and promotion decisions were made with a consideration of racial/ethnic animus toward Hispanics.

d.    Whether these pay raise and promotion decisions were neutral but disparately impacted Hispanics in practice.

e.    Whether Defendants intentionally and specifically targeted Class members in leadership and/or management positions in a concerted effort to either demote them or drive them to quit.

f.    Whether Class members have been damaged, and if so, what is the appropriate relief as to each member of the Class; and,

g.    Whether Class members are entitled to injunctive relief or other equitable relief against the Defendants.

21.    *Typicality* - FRCP 23(a)(3):  The named Plaintiff's claims encompass the challenged practices and course of conduct of the Defendants.  Furthermore, Plaintiff's legal claims are based on the same legal theories as the claims of the putative Class members.  The legal issues as to whether

the Federal and State laws cited herein are violated by such conduct apply equally to the Plaintiff and to the other Class members.

22. *Adequacy* - FRCP 23(a)(4): The named Plaintiff has no interest adverse to those of the members of the Class members and will fairly and adequately protect the interests of the class. Plaintiff has retained competent counsel experienced in the prosecution of complex employment discrimination litigation.

23. FRCP 23(b)(1): Prosecuting separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests and (C) would create the potential for the immense waste of judicial resources.

24. FRCP 23(b)(2): Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

25. FRCP 23(b)(3): Common questions of law and fact predominate over questions affecting only individuals, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

a. While the individual compensatory damages suffered by each class member is not insignificant, it is not substantial enough to justify the expense and burden of individual litigation.

b.      To conduct this action as a class action under FRCP 23(b)(3) presents few management difficulties, conserves the resources of the parties and the court system, protects the rights of each Class members, and maximizes recovery to them.

## VII.  Material Facts

### *Personal and Employment Background*

26.     Plaintiff is a Hispanic male of brown complexion born in the Dominican Republic.

27.     Plaintiff was employed by the Defendants since on or about January 30, 2017 at their facility located at 1400 Division Road, West Warwick, RI 02893.

28.     Approximately five-hundred (500) employees work for Defendants at the facility and any given time during the relevant time period.

29.     Of those five-hundred (500) employees about one-hundred (100) were/are Hispanic at any given time during Plaintiff's employment with Defendants.

30.     Throughout Plaintiff's employment with Defendants, Defendants employed at least six (6) supervisors of which only one (1) was Hispanic and the remaining Caucasians; at least seven (7) superintendents/managers of which all are Caucasians and none are Hispanics; and at least sixteen (16) group leaders of which only two (2), including Plaintiff, are Hispanics and the remaining Caucasians and non-Hispanics.

31.     Thus, despite one-in-five (1 in 5) employees of Defendants being Hispanic only three (3) out of twenty-nine (29) employees in supervisory and/or leadership roles were Hispanic during Plaintiff's employment with Defendants.

32.     This equates to twenty percent (20%) of the workforce being Hispanic, but only a maximum of ten percent (10%) of the employees in supervisory and/or leadership roles being Hispanic.

33.     At all relevant times, Plaintiff was employed by the Defendants as a "Group Leader" until his demotion or about August 16, 2019.

34.     As Group Leader, Plaintiff was compensated at a rate of $27.18 per hour plus benefits.

35.     Despite the discriminatory actions taken against Plaintiff as described herein, Plaintiff successfully performed his job duties as Group Leader and was frequently praised for his job performance and work ethics.

36.     At all relevant times Plaintiff was an excellent, dedicated, and loyal worker without any history of work deficiencies.

37.     Nevertheless, throughout Plaintiff's employment, his race, national origin, and/or color were not treated in a neutral manner by the Defendants, and in fact, were held against him.

### *Facts Applicable to all Plaintiff and Class Members*

38.     On information and belief, Plaintiff's discriminatory treatment by the Defendants is part of a larger pattern and practice of workplace discrimination specifically targeting Hispanics and/or Brown complexioned people in the workplace.

39.     Specifically, at all relevant times, Defendants' maintain a workplace which was and is dominated by non-Hispanic, mostly Caucasian employees.

40.     Defendants' non-Hispanic, mostly Caucasian employees are routinely treated substantially better, in terms of management/promotion opportunities, disciplinary treatment, pay, and benefits, than Hispanic employees, including those with greater or equal experience.

41.     Plaintiff, like his similarly situated current and former coworkers, had no option but to put up with both the discriminatory treatment and hostile work environment forced upon him or risk losing his job or position.

### *Discriminatory Treatment and Hostile Work Environment*

42.     Since the onset of Plaintiff's employment with Defendants, he, along with similarly situated Hispanic co-workers, have had to endure almost daily racist remarks against Hispanics in the workplace by co-workers and supervisors alike.

43.     Supervisors both took part in these almost daily racist remarks and failed to discipline or otherwise prevent their subordinates from making said remarks.

44.     In fact, Plaintiff's supervisor at the time of the events alleged herein, who is Caucasian/White (hereinafter referred to as "Plaintiff's Supervisor"),  has made open derogatory remarks against Plaintiff specifically as well as Hispanics in general and condoned similar discriminatory treatment and remarks by others in the workplace.

45.     For instance, Plaintiff's Supervisor laughed when a Caucasian/White Superintendent referred to certain Hispanics as "F*cking Puerto Ricans."

46.     Additionally, Plaintiff's Supervisor also voiced his relief to Plaintiff that he, meaning Plaintiff's Supervisor, did not have to "grow up with Hispanics."

47.     Further, throughout Plaintiff's employment, there have been relentless other racist and/or stereotyping jokes or comments by Defendants' Caucasian, non-Hispanic employees and supervisors including the following:

  a.  Comments were made regarding Hispanics from the Dominican Republic, which is where Plaintiff was born, "coming here only to commit crimes."

  b.  Whenever Plaintiff and/or other Hispanic employees said anything in Spanish, other employees and supervisors mocked them by saying something to the effect of "is this America or what? Speak English!"

  c.  Plaintiff has been disparagingly referred to as "Dominicanito" or "little Dominican," in a demeaning manner, by Caucasian, non-Hispanic co-workers.

      d.  Plaintiff's Supervisor openly described Hispanic employees as "not being able to count."

48.    Moreover, the ongoing race discrimination manifested itself in tangible actions taken against Plaintiff and other similarly situated Hispanic employees, including, for instance:

    a.  Hispanic employees, including Plaintiff, were and, on information and belief continue to be, routinely assigned undesirable job duties and less managerial responsibilities than their Caucasian or non-Hispanic counterparts.

    b.  Hispanic employees, including Plaintiff, faced, and, on information and belief continue to face, harsher disciplinary treatment for purported work deficiencies than their Caucasian or non-Hispanic counterparts, including those with more severe performance deficiencies.

    c.  Hispanic employees, including Plaintiff, for the most part earned, and, on information and belief continue to be earn, less compensation than their Caucasian, non-Hispanic counterparts despite having greater or equal job experience.

    d.  Hispanic employees, including Plaintiff, were and, on information and belief continue to be, passed over for promotions or leadership positions in favor of our Caucasian or non-Hispanic counterparts.

49.    Additionally, throughout his employment, Plaintiff was threatened with disciplinary action, on more than one occasion, for speaking Spanish in the workplace.

50.    In fact, Defendants, by and through Plaintiff's Supervisor, inexplicably banned Plaintiff and other Hispanic co-workers/Class members from speaking Spanish in the workplace, even while on lunch break.

51.    Instead, Plaintiff and other Hispanic Class members were and are essentially forced to walk on eggshells knowing that one slip of their native language may cost them their jobs.

52.    On information and belief, Spanish is the only foreign language banished from the workplace.

53.     Notably, neither Plaintiff's Supervisor, nor anyone else in the Defendants' management, provided any legitimate business reason for this openly discriminatory requirement.[1]

54.     Despite the Defendants knowing about this ongoing discrimination against Plaintiff and other Hispanics in the workplace, both via observation and complaints Plaintiff and others have made, the Defendants have taken no remedial action to discipline and/or train the perpetrators or otherwise eliminate the unlawful and discriminatory practices in the workplace.

55.     In fact, on information and belief, Plaintiff's Supervisor has had multiple complaints of workplace race discrimination made against him; yet no disciplinary action has ever been taken against him, including even a warning or order to cease such behavior.

### *Adverse Employment Actions*

56.     Around June of 2017, Worthington Industries, Inc. acquired AMTROL, Inc.

57.     Subsequently, the racially hostile workplace Plaintiff and other similarly situated Hispanic employees/Class members were subjected to went from bad to worse.

58.     Plaintiff, along with the few other Hispanic employees in management or leadership positions, were specifically targeted in a concerted effort to either demote them or drive them to quit.

59.     Unsurprisingly, these management or leadership positions opened-up by demoting or forcing Hispanic employees in management or leadership positions to quit have subsequently been filled with Caucasian or non-Hispanic employees.

60.     In fact, Plaintiff's Supervisor frequently referenced his disdain and hostility towards Plaintiff holding a leadership position by telling Plaintiff "I don't know how you got this position

---

[1] *See* 29 C.F.R. § 1606.7(a) ("A rule requiring employees to speak only English at all times in the workplace is a burdensome term and condition of employment. The primary language of an individual is often an essential national origin characteristic. Prohibiting employees at all times, in the workplace, from speaking their primary language or the language they speak most comfortably, disadvantages an individual's employment opportunities on the basis of national origin. It may also create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment. Therefore, the Commission will presume that such a rule violates title VII and will closely scrutinize it.")

when you can't even write English" – which, in addition to being discriminatory, is factually inaccurate.

61.    Eventually, the constant verbal harassment and fear of losing his job for no other reason besides his race, national origin, and/or color took a substantial emotional toll on Plaintiff through symptoms of depression, stress, and anxiety.

62.    In July 2019, Defendants, by and through their agents, continued their discriminatory actions against Plaintiff by fabricating allegations of misconduct against Plaintiff.

63.    Specifically, on or about July 31, 2019, Plaintiff learned that the Defendants had started a purported investigation into a false allegation that Plaintiff was "speaking bad about a co-worker" in Spanish the preceding Saturday, July 27, 2019, while Plaintiff was working in the warehouse.

64.    Notably, Plaintiff only became aware of the investigation after coworkers informed Plaintiff that "HR wanted to get [Plaintiff] in trouble" rather than anyone in HR or management asking Plaintiff about what purportedly happened.

65.    Thereafter, rumors began to spread in the workplace that Plaintiff was going to be fired.

66.    The next day, on a Thursday, Plaintiff observed his Supervisor take notes before and during Plaintiff's pre-shift meeting.

67.    Plaintiff's Supervisor subsequently revealed that he was noting down "people who spoke Spanish to [Mr. Cordero] before the pre-shift meeting."

68.    That same day, Plaintiff was finally approached by a Human Resources Representative named "Amie" who called him into a meeting.

69.     During that meeting, Plaintiff was repeatedly asked if Plaintiff had spoken Spanish with anyone at any time while at work generally as well as whether Plaintiff had bad-mouthed someone in Spanish on July 27, 2019.

70.     Plaintiff responded that he did not bad mouth anyone in Spanish and any allegation that he had was not plausible because no one he worked with in close proximity on July 27, 2019 spoke or comprehended Spanish.

71.     The next day, on or about August 2, 2019, Plaintiff was again summoned by Human Resources.

72.     This time, however, Human Resources alleged that, over one and a half months prior, Plaintiff grabbed a co-worker by the arm.

73.     Plaintiff denied the fabricated allegations and questioned why the old allegation was never previously reported.

74.     Following the August 2, 2019 HR meeting, Plaintiff's Supervisor repeatedly approached Plaintiff in an intimidating manner and told Plaintiff to "assume responsibility," to which Plaintiff responded that he did nothing wrong to "assume responsibility" for.

75.     On or about August 8, 2019, Plaintiff's Supervisor again approached Plaintiff telling him to accept responsibility and Plaintiff again explained that he did nothing wrong.

76.     During that same August 8, 2019 conversation, Plaintiff complained to his Supervisor that Plaintiff felt he was being targeted and discriminated against because he is Hispanic.

77.     Moreover, Plaintiff told his Supervisor that it was obvious that Plaintiff's Supervisor and Human Resources had already decided Plaintiff was guilty, or wanted to assume the same, without even conducting a legitimate investigation.

78.     That same day, Plaintiff's stress and anxiety escalated to the point that he began experiencing significant headaches and had to leave work early to seek medical treatment after so informing his Supervisor.

79.     Prior to leaving work that day, Plaintiff also spoke to Amie at Human Resources to inform her that he needed to seek medical treatment

80.     During that conversation with Amie, Plaintiff informed her that he was being discriminated against and persecuted because he is Hispanic.

### *Plaintiff's Demotion*

81.     Thereafter, on or about August 16, 2019, Plaintiff was called into a meeting with Human Resources.

82.     Present at the meeting were Stephanie L/N/U (Human Resources Manager), Ellen Sweet L/N/U (Plant Manager), Shawn L/N/U (Superintended) and Phil L/N/U (Superintendent).

83.     During that August 16, 2019 meeting, without explanation or opportunity to correct any purported work deficiency, Plaintiff was suddenly told that he was being removed from his position as Group Leader and was being demoted to "Tester/Packer."

84.     Plaintiff was further told that his hourly compensation rate was being cut from $27.18 per hour to $20.50 per hour.

85.     Plaintiff objected to his demotion, but, despite his objection, he was demoted effective August 19, 2019.

86.     The prospect of being demoted and losing a significant amount of his income caused Plaintiff significant emotional distress.

87.     Plaintiff had to seek medical treatment and was diagnosed with depression and anxiety.

88.     Additionally, Plaintiff began receiving treatment for tension headaches caused by the stress of the concerted discriminatory conduct he experienced.

89.     Subsequently, Plaintiff's Medical Provider ordered that he take a medical leave of absence beginning on August 19, 2019.

90.     As noted above, Plaintiff's demotion is part of a pattern and practice of removing Hispanics from leadership positions and replacing them with non-Hispanic, Caucasian employees.

91.     Additionally, Plaintiff's pay cut is also part of a pattern and practice of unfair/disparate pay practices towards Hispanic employees.

92.     For example, during Plaintiff's employment with Defendant, Plaintiff advocated on behalf of a Hispanic Lead Packer, Dina, who although she was been employed by Defendants for almost twenty (20) years was only earning $20.00 per hour while a recently hired, non-Hispanic and Caucasian Lead Packer was compensated at almost the same hourly rate as Dina.

93.     Around the time of Plaintiff's demotion, Defendants hired non-Hispanic, Caucasian employees who are being paid the same pay rate as Hispanic employees with over twenty (20) years of experience.

94.     Moreover, out of the five (5) then-recent management promotions, all have been Caucasian, non-Hispanics despite qualified Hispanic workers eligible for promotion also working for Defendants.

95.     On information and belief, Plaintiff was replaced, or his Group Leader duties were assumed by, a non-Hispanic, Caucasian employee.

96.     Subsequently, Plaintiff sought to get Defendants to reverse his unlawful demotion and to be reassured that he would not face further retaliation and disparate treatment in the workplace.

97.    Defendants refused to reinstate Plaintiff to his prior position with his prior compensation.

98.    Since going on his medical leave of absence in August of 2019, Plaintiff's emotional distress and depression and anxiety symptoms worsened as a result of his discriminatory or retaliatory demotion, his prior discriminatory and retaliatory treatment by Defendants, and Defendants continued discriminatory or retaliatory actions in their subsequent failure to correct their discriminatory or retaliatory treatment of Plaintiff.

99.    Plaintiff's emotional distress and depression and anxiety symptoms worsened to the point at which Plaintiff's medical provider advised that Plaintiff should not return to work with Defendants due to the negative and detrimental effect that the working conditions would have on Plaintiff's health.

100.    As a result, on February 23, 2020, Plaintiff was forced into a constructive discharge when he submitted his letter of resignation to Defendants based upon his medical provider's recommendation.

### *Race/National Origin/Color Discrimination*

101.    Plaintiff is a brown, Hispanic male born in the Dominican Republic and, at all relevant times, a member of a protected class.

102.    For the reasons discussed above, Defendants' conduct constitutes unlawful race, national origin, and/or color motivated discrimination under Title VII, the FEPA, and the RICRA.

103.    The fact that Plaintiff is a brown and/or Hispanic male and/or born in the Dominican Republic was a motivating factor in the discriminatory treatment and eventual demotion that he suffered at the hands of Defendants.

104.    Adverse employment action based in whole or *even in part* on account of race, national origin, and/or color constitutes prohibited discrimination and/or retaliation.

105.    For the reasons set forth herein, Defendants' similar conduct towards other similarly situated individuals also constitutes unlawful race, national origin, and/or color motivated discrimination under Title VII and the FEPA.

### Disparate/Adverse Impact

106.    Additionally and/or in the alternative, Defendants' employment policies or practices referenced herein, or the enforcement of said polices or practices, including those practice relating to promotions, raises, demotions, and discipline, have a disproportionate adverse effect on Hispanic, Non-Caucasian employees, including Plaintiff and other similarly situated coworkers, for the reasons set forth herein such that Defendants have violated Title VII, the FEPA, and the RICRA.

### Retaliation

107.    At all relevant times, Plaintiff complained to the Defendants about race, national origin, and/or color-based discrimination and disparate treatment regarding the terms of his employment and treatment in the workplace as well as the terms of employment and treatment of other Hispanics in the workplace.

108.    Prior to his termination, Plaintiff asserted his right and the right of fellow Hispanics within the Class be free from race, national origin, and/or color-based discrimination and disparate treatment in the terms and conditions of their employment, including compensation, promotion, and discipline.

109.    Under Title VII, and the FEPA, Plaintiff is expressly protected from retaliatory conduct by an employer for voicing his concerns of ongoing race, national origin, and/or color discrimination.

110.     Plaintiff is further protected from retaliatory conduct for complaints about violations of the RICRA under the Whistleblower Act.

111.     When Plaintiff reported what he believed to be race, national origin, and/or color discrimination and/or disparate treatment, Plaintiff was engaged in a protected activity.

112.     Accordingly, additionally or in the alternative, shortly after engaging in the above-mentioned protected activity, Defendants entered into a concerted effort to end Plaintiff's employment and/or his leadership role and higher rate of pay by retaliating against him as explained above, including his demotion.

### Intent to Discriminate and/or Retaliate

113.     Defendants' intent to discriminate against Plaintiff and Class members on account of their race, national origin, and/or color and/or retaliate against Plaintiff for engaging in protected activity is further established, in part, by the fact that Non-Hispanic, Caucasian workers were routinely treated better in terms of compensation, job duties, promotion opportunities, and discipline.

114.     Defendants' failure to follow their own policies and procedures relative to demotions, promotions, compensation, and discipline further supports an inference of discriminatory intent.

115.     Additionally, the temporal proximity of Plaintiff's protected conduct to the Defendants' adverse employment action, almost immediately, also raises a compelling inference of discriminatory intent by Defendants.

### Damages

116.     Plaintiff has suffered equitable and compensatory damages, including, but not limited to, loss of income, pain and suffering, emotional distress, loss of enjoyment of life, loss of medical and/or other benefits, humiliation, damage to Plaintiff's professional and personal reputation, and other great harm as a result of being discriminated/retaliated against by Defendants in the manner

alleged herein or as a result of the disparate impact of Defendants' policies and procedures as alleged herein.

117.    Class members have also suffered equitable and compensatory damages, including, but not limited to, loss of income, pain and suffering, emotional distress, loss of enjoyment of life, loss of medical and/or other benefits, humiliation, damage to their professional and personal reputation, and other great harm as a result of being discriminated against by Defendants in the manner alleged herein or as a result of the disparate impact of Defendants' policies and procedures as alleged herein.

## VIII.   Causes of Action

118.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 117 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

### Count One
### As to Plaintiff and All Class Members
### *Title VII of the Civil Rights Act of 1964,*
### *42 U.S.C. § 2000e, et seq.*

119.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, disparately treated and discriminated against Plaintiff and Class members as alleged herein or enforced policies and procedures that disparately impacted Plaintiff and Class members as alleged herein in violation of Title VII, thereby depriving Plaintiff and Class members of rights secured under the Title VII causing Plaintiff and Class members to suffer damages as aforesaid.

### Count Two
### As to Plaintiff and All Class Members
### *Rhode Island Fair Employment Practices Act,*
### *R.I. Gen. Laws § 28-5-1, et seq.*

120.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, disparately treated and discriminated against Plaintiff and Class members as alleged herein or enforced policies and procedures that disparately impacted Plaintiff and Class members as alleged herein in violation of the FEPA, thereby depriving Plaintiff and Class members of rights secured under the FEPA causing Plaintiff and Class members to suffer damages as aforesaid.

**Count Three**
**As to Plaintiff and All Class Members**
***Rhode Island Civil Rights Act of 1990,***
***R.I. Gen. Laws § 42-112-1, et. seq.***

121.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, disparately treated and discriminated against Plaintiff and Class members as alleged herein or enforced policies and procedures that disparately impacted Plaintiff and Class members as alleged herein in violation of the RICRA, thereby depriving Plaintiff and Class members of rights secured under the RICRA causing Plaintiff and Class members to suffer damages as aforesaid.

**Count Four**
**Retaliation as to Plaintiff Only**
***Title VII of the Civil Rights Act of 1964,***
***42 U.S.C. § 2000e, et seq.***

122.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of Title VII, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under Title VII.

**Count Five**
**Retaliation as to Plaintiff Only**
*Rhode Island Fair Employment Practices Act,*
*R.I. Gen. Laws § 28-5-1, et seq.*

123.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the FEPA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the FEPA.

**Count Six**
**Retaliation as to Plaintiff Only**
*Rhode Island Whistleblower Protection Act,*
*R.I. Gen. Laws § 28-50-1, et seq.*

124.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the Whistleblower Act, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the Whistleblower Act.

**IX.    Prayers for Relief**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court grant the following relief as to Plaintiff and Class members:

1.    A declaratory judgment declaring the acts and/or omissions of Defendants, including, but not limited to those complained of herein, to be in violation of the Title VII, the FEPA, the RICRA, and/or the Whistleblower Act.

2.    An injunction or other equitable relief directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.      An injunction and/or other equitable relief, including but not limited to an award of back pay, front pay, actual damages, full reinstatement of employment, fringe benefits, and seniority rights, as well as other compensation and/or benefits to make Plaintiff and Class members whole for all earnings and benefits they would have received but for Defendants' unlawful treatment.

4.      An award of compensatory damages.

5.      An award of emotional distress and pain and suffering damages.

6.      An award of exemplary and/or punitive damages.

7.      An award of prejudgment interest, reasonable attorneys' fees, and costs.

8.      Such other and further relief as this Court deems just and proper.

## X.    **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all counts so triable.

## XI.    **Designation of Trial Counsel**

Plaintiff hereby designates Richard A. Sinapi, Esq., and Danilo A. Borgas, Esq. as trial counsel.

Plaintiff,
By his attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated:  October 2, 2020**          **/s/ Richard A. Sinapi, Esq.**
**Richard A. Sinapi, Esq. (#2977)**
**Danilo A. Borgas, Esq. (#9403)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690
FAX: (401) 739-9040
Email:  ras@sinapilaw.com
          dab@sinapilaw.com